IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HOUSTON FEDERATION OF TEACHERS, LOCAL 2415, DANIEL SANTOS, PALOMA GARNER, IVAN CASTILLO, ANDY DEWEY, JOYCE HELFMAN, MYLA VAN DUYN, and ARACELI RAMOS | § § § § § § § § § | |
| Plaintiffs | § § | |
| v. | § § | CIVIL ACTION NO. _____ |
| HOUSTON INDEPENDENT SCHOOL DISTRICT, | § § § § | |
| Defendant | § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

### I.  INTRODUCTION

1.  This cause is filed under 42 U.S.C. Section 1983 to challenge and redress Houston Independent School District's violation of the constitutional rights of teachers to due process and equal protection under the Fourteenth Amendment to the United States Constitution.   The challenged actions were taken under color of state law. The plaintiffs seek equitable, declaratory, injunctive relief, and attorneys' fees.

### II.  JURISDICTION AND VENUE

2.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. Sections 1331 and 1343, as this case involves a matter of federal law and arises under the rights and liberties provided for in the United States Constitution.

1

3.   Venue is proper in this Court as defendant Houston Independent School District is a political subdivision located within Harris County, Texas, within this division of the Southern District of the United States District Court.

### III.  PARTIES

4.   Plaintiff Houston Federation of Teachers ("HFT") is a labor union that represents teachers and other employees of Houston Independent School District in matters related to their wages, hours, and terms and conditions of employment. It is affiliated with the Texas American Federation of Teachers, a statewide organization, and the American Federation of Teachers, a national organization.   As required of labor organizations representing public employees in Texas, HFT does not claim the right to strike.   HFT has its principal place of business at 3100 Weslayan #255, Houston, Texas 77027-0081, in Harris County, Texas.

5.   Plaintiff Daniel Santos is a sixth grade social studies teacher at Jackson Middle School. He has taught for HISD since 2006. During his teaching career, he has received numerous awards, both district-wide and on the Jackson campus, including being named as a finalist for HISD's Alternative Certification Program Intern of the Year in 2006-2007, his first year of teaching, and being named as the Jackson Teacher of the Year in 2007 – 2008. In 2014, he received special recognition from HISD for regularly going above and beyond the regular duties of a teacher. In addition to his teaching responsibilities, Mr. Santos takes it upon himself to sponsor several clubs and after-school activities for Jackson students. He communicates his own passion for social justice to his students.

6.   Plaintiff Paloma Garner is a ninth grade biology teacher at Davis High School. She has taught for HISD since 2004.   She started her teaching career with Teach for America and helped

write the national curriculum for biology for Teach for America. OneGoal, a national organization that identifies and trains effective teachers to assist underperforming students who wish to attend college, selected her to be a mentor.    Similarly, in 2013, the UTeach program at the University of Houston, a program that seeks to develop and support innovative teaching in the areas of science, technology, engineering and mathematics, recognized Ms. Garner as an exemplary mentor teacher. Her students repeatedly single her out as a teacher who inspires them.

7.    Plaintiff Ivan Castillo is a fourth grade bilingual teacher at Briscoe Elementary School. He has taught for HISD since 1994, with all of those years at Briscoe. He is a bilingual teacher in the campus' dual language program and has served as a leader for his grade level. Mr. Castillo is the Briscoe Elementary Bilingual Teacher of the Year in 2013 – 2014 and is a finalist for Bilingual Elementary Teacher for HISD. He was also the Briscoe Bilingual Teacher of the Year in 2006 – 2007 and 2001 – 2002. In 1998 – 1999, he was the Briscoe Elementary Teacher of the Year. HISD administrators have praised the way in which he consistently engages his students and provides excellent feedback to them.

8.    Plaintiff Andy Dewey is a history teacher at Carnegie Vanguard High School. He has taught for HISD since 1978. He teaches Advanced Placement U.S. history as well as two history electives: a course called "1968" and another called "The World Wars." Mr. Dewey developed the curriculum for his two elective courses, both of which are very popular with Carnegie Vanguard students. Before moving to Carnegie Vanguard when it opened, Mr. Dewey taught in the magnet program at Jesse Jones High School.    His performance is consistently rated well by his administrators. In 2004 – 2005, he was the Carnegie Vanguard Teacher of the Year. Mr. Dewey's students come back year after year to tell him how well they are doing in college and what a

3

difference he made in their lives.

9.  Plaintiff Joyce Helfman is an eighth grade English teacher at Johnston Middle School. She has been teaching at Johnston since 2004.   She regularly teaches the gifted and talented English sections. Every year, Ms. Helfman organizes and sponsors a field trip for her students to the Holocaust Museum. She has a consistent record of strong performance and is well respected by her colleagues at Johnston.

10. Plaintiff Myla Van Duyn is a ninth grade biology teacher at Davis High School. She has taught for HISD since 2001. She has won several teaching awards, including being honored in 2013 as an exemplary teacher by the UTeach program at the University of Houston, a program that seeks to develop and support innovative teaching in the areas of science, technology, engineering and mathematics, and has been nominated as Teacher of the Year at Davis. She has produced biology labs that are used by science teachers across HISD and published a biology lesson. Ms. Van Duyn was selected to receive a grant for innovative professional development by a national organization, the Fund for Teachers. She successfully instills her own curiosity for science in her students.

11.   Araceli Ramos is a ninth grade English teacher at Austin High School. She has taught for HISD since 1997. All of her time teaching high school English has been spent at Austin High. Ms. Ramos grew up in a low-income home and was the first member of her family to attend college. She has devoted her teaching career to teaching and helping similarly situated students. She sought out the assignment to Austin High for this very reason.   Ms. Ramos has won accolades from students and teachers for her expertise and devotion to her students. In 2014, Ms. Ramos was

asked by her campus counselor to tutor teachers on the Texas English Language Proficiency

Assessment System.

12.    Defendant Houston Independent School District ("HISD") is a political subdivision

of the State of Texas. It is an independent school district within the State of Texas, organized

pursuant to state law, and charged with the responsibilities of operating and maintaining a public

school system within its geographical boundaries. It may be served through its Superintendent, Dr.

Terry Grier, Houston Independent School District, 4400 West 18th Street, Houston, Texas 77092.

### IV.    ASSOCIATIONAL STANDING of HFT

13.    HFT has over 6000 members, the majority of whom are classroom teachers. As a

labor union, HFT is interested in enforcing and protecting the employment rights of its members,

who work hard to provide an education to the schoolchildren who attend HISD schools.   Further,

among the purposes of HFT is the improvement of public education in Texas, which is tied

inextricably to the improvement of the working conditions and professional standing of teachers

and other public school employees. Thousands of HFT's members are aggrieved by the actions of

the defendant and HFT brings this action on their behalf.

14.    HFT is a consultation representative for HISD teachers and other employees and has

the largest number of representatives on the HISD consultation committee. HFT meets monthly

with members of the HISD administration in consultation over terms and conditions of

employment. HFT has the protection of employment rights and benefits of its members as one of

its central purposes.   This action is germane to that purpose.

15.    HFT members who are aggrieved by the actions of the defendant have standing to file

this action on their own behalf.

16.   Neither the claims asserted herein nor the relief requested requires the filing of individual petitions for relief nor the participation of individual members as parties in this action.

## V.   STATEMENT OF FACTS

**A.     Teacher contracts in HISD.**

17.   In HISD, all teachers are employed under one of three types of individual employment contracts: probationary, term, or continuing. *See* Tex. Educ. Code §21.102, §21.204, §21.154.   A teacher will be placed on a probationary contract for the first three years of employment, after which time she will receive a term contract.   HISD issues one year term contracts to all teachers who have completed probation. HISD ceased issuing continuing contracts in 1996 but still has thousands of teachers who hold continuing contracts because they received those contracts prior to 1996.

18.   Regardless of the type of contract that a teacher holds, he or she has a property interest in employment during the term of the contract.

19.   In HISD, as in other Texas school districts, the applicable standards and procedures for terminating or nonrenewing teachers depend on what type of employment contract the teacher possesses. Specifically, continuing contract teachers have a contract of indefinite duration, with termination to occur only upon good cause, and employment to continue until the teacher either resigns, retires, is released at the end of a school year in a reduction in force, or is terminated for cause. Tex. Educ. Code §21.154; §21.156. A term contract teacher may only be terminated for good cause during term of contract. Tex. Educ. Code §21.211(a). While the Texas Education Code specifies that a term contract teacher does not possess a property interest in continued employment beyond the term of the contract, the Education Code provides for due process rights in conjunction

6

with the nonrenewal of the contract and requires that the nonrenewal be for a pre-established

reason in a district's nonrenewal policy. Tex. Educ. Code §21.204(a) and (e); §21.207. A

probationary contract teacher may only be terminated for good cause during term of contract but

may be terminated at the end of the contract year if the school board determines that it is in the best

interest of the district to do so. Tex. Educ. Code §21.104(a); §21.103(a)

      20.   Under the Texas Education Code, the Texas Education Agency, acting through the

Commissioner of Education, is charged with hearing appeals of termination or nonrenewal

decisions made by local school districts, and interpreting the pertinent provisions of the Education

Code. *See* Tex. Educ. Code Section 7.055(b)(1)(3); 21.301 *et seq*.

**B.**    **Measuring teacher performance in HISD.**

      21.   In the 2012 - 2013 school year, HISD began counting student performance on

standardized tests as the most significant component of a teacher's performance appraisal. *See*

HISD Policy DNA (Regulation). For teachers who teach the core subjects of reading, writing,

math, science, and social studies, HISD counts student performance as 50% of a teacher's overall

appraisal score. The other two measures of a teacher's performance are instructional practice and

professional expectations, each counting 25%.

      22.   With regard to student performance, HISD's teacher appraisal system provides that a

teacher's ratings will be based on how his or her students perform on end-of-year or end-of-course

tests.   Teachers are supposed to have two measures of student performance included in their

performance appraisal.   Student performance is measured by student "growth" -- that is,

comparing a student's current performance to his performance in years past -- and/or student

achievement levels.   Depending on the subject and the grade level, there are five possible student

performance measures: value-added growth, comparative growth on district-wide assessments, students' progress on district-wide or appraiser-approved assessments, students' progress on district-wide appraiser-approved performance tasks or products, and student attainment on district-wide or appraiser-approved assessments. *See* HISD Teacher Appraisal and Development System Student Performance Guidebook, available at

http://hisdeffectiveteachers.org/assets/SP_Guidebook_7-11-12_FINAL_with_links.pdf.

23.    The primary test that HISD uses in measuring student growth is the State of Texas Assessment of Knowledge and Skills (STAAR) test, the state-mandated, state-wide, standardized assessment test. The STAAR test is a criterion-referenced test, meaning that it is intended to measure how well a student has learned a specific body of knowledge and skills – in this case, the curriculum standards, the Texas Essential Knowledge and Skills (TEKS), for a subject area and grade level. *See* description of STAAR test, available at

http://www.tea.state.tx.us/student.assessment/staar/.    The STAAR program requires its tests to be administered in the core subjects of reading, writing, math, science and social studies. It includes end-of-year assessments for grades 3 - 8 in reading and math, in writing at grades 4 and 7, in science at grades 5 and 8, and in social studies at grade 8.   At the high school level, it includes end-of-course assessments in English I (grade 9), English II (grade 10), Algebra I (grade 9), biology (typically grade 9) and U.S. History (typically grade 11).   *See* Student Performance Measures by Grade Level, available at

http://hisdeffectiveteachers.org/assets/Measures_by_Grade_Level_Revised_10_4_12.pdf.

24.    Not all core subjects in all grades are STAAR-tested.   In some subjects and grades, such as science in grades 4, 6, and 7, and social studies in grades 4, 5, 6, and 7, HISD administers

another standardized test, the Stanford test (or Aprenda, the Spanish language version of the

Stanford test). Unlike the criterion-referenced STAAR test, the Stanford/Aprenda test is a national

norm-referenced test, a form of test designed to compare test takers taking the same test all over

the United States. Unlike the STAAR test, the Stanford test is not based on the required curriculum

for Texas schools. *See* description of the Stanford test, available at

http://www.pearsonassessments.com/learningassessments/products/100000415/stanford-achieve

ment-test-series-tenth-edition.html. In a norm-referenced test, scores are reported as a percentage

rank with half scoring above and half scoring below the midpoint. In HISD, if the STAAR test is

not available but the Standford/Aprenda is, HISD incorporates the student scores on the

Stanford/Aprenda test into the student performance measure. *See* Student Performance Measures

by Grade Level, available at

http://hisdeffectiveteachers.org/assets/Measures_by_Grade_Level_Revised_10_4_12.pdf.

     25.   For teachers who teach other grade levels or subjects, such as pre-kindergarten

through second grade, non-core subjects in grades 3 - 8, and high school teachers who teach

courses that do not yet have a STAAR end-of-course assessment associated with the course, HISD

uses the students' performance on other types of assessments to generate the students'

performance measure. *Id.*

     26. With regard to the instructional practice area, the teacher's performance is assessed

through classroom observations and is measured through the application of 13 instructional

criteria, such as engaging students in higher-level instruction, facilitating student-centered lessons,

developing student learning goals, and maximizing instructional time. *See* HISD Teacher

Appraisal and Development System, Rubrics, available at

9

http://hisdeffectiveteachers.org/individualized-support/resources-for-teachers-and-appraisers/rub ric.pdf.   A teacher's performance in the professional expectations area is assessed through the application of a set of 9 objective, measurable standards reflecting the teacher's professionalism, such as compliance with policies and procedures, collaboration with colleagues, and attendance. *Id.*

## C.    Value-added EVAAS® scores.

27.   HISD teachers who teach core subjects receive a student performance score that is derived using a value-added statistical model. For those teachers who have a value-added student performance score, student performance will count for approximately 50% of teacher's summative rating. *See* HISD's Frequently Asked Questions about Student Performance, available at http://hisdeffectiveteeachrs.org/studentperformance/faq.

28. Where available, HISD will use a value-added measure and a comparative growth measure (a measurement of the progress of a teacher's students on a given assessment compared to the progress of all other students within the school district who start at the same test-score level) to assess student performance for the purposes of the teacher's appraisal. HISD prefers the value-added measure over all other measures and will use it for all teachers for whom it is available. If a teacher is one who receives a value-added score, the value-added score will always be used as the "first measure" in rating the teacher for student performance.   *See* HISD Teacher Appraisal and Development System Student Performance Guidebook at 17, available at http://hisdeffectiveteachers.org/assets/SP_Guidebook_7-11-12_FINAL_with_links.pdf.

29.   In general, value-added methodology in this context examines student test scores over a period of time. As applied to individual teachers, it purports to isolate and measure the effect of a

single teacher on a student's academic growth over the school year, as opposed to the cumulative effect of prior years of education or other teachers.   Further, depending on the detail of the particular type of value-added model, the methodology attempts to control for the influence of classroom and/or student characteristics outside the teacher's control, so that a percentage of growth can be attributed to a particular teacher over a specified period of time; in other words, so that it can be determined if a particular teacher has "added value" to the student's performance. Many academics and scientists have been highly critical of the validity of using value-added methodology to measure the effectiveness of individual teachers, citing, among other factors, three well-documented problems: 1) value-added models of teacher effectiveness are highly unstable; 2) teachers' value-added ratings are significantly affected by differences in the students who are assigned to them, and 3) value-added ratings cannot disentangle the many influences on student progress. Darling-Hammond, L., *et al.,* Getting Teacher Evaluation Right, A Background Paper for Policy-Makers*, National Academy of Education and American Educational Research Association* (2011).

30.    There are many vendors who market value-added statistical models using different formulas, different assumptions, and different controls. Value-added models vary based on a number of factors, including not just the mathematical constructs that are employed, such as the particular algorithms used to perform the calculations, but also on the variety of assumptions that are used in analyzing the data. Different models yield different results about which teachers can be considered to have "added value."

31.    All value-added models, though, are merely statistical predictions about how a student will score on a standardized test based on how the student performed in the past.

According to a recent statement from the largest national organization of statisticians, the American Statistical Association, value-added scores "have large standard errors, even when calculated using several years of data. These large standard errors make rankings unstable, even under the best scenarios for modeling." American Statistical Association (April 8, 2014), *ASA Statement on Using Value-Added Models for Educational Assessment* at 7, available at http://www.amstat.org/policy/pdfs/ASA_VAM_Statement.pdf. Accordingly, statisticians and other experts have cautioned that the estimates from such modeling are too imprecise to support inferences about the effectiveness of an individual teacher. *See, e.g.* RAND Corporation (2004), *The Promise and Peril of Using Value-Added Modeling to Measure Teacher Effectiveness,* Santa Monica, CA: RAND Education Research Brief, available at www.rand.org. The National Academies, Division of Behavioral and Social Sciences and Education, have stated: "VAM [value-added models] estimates of teacher effectiveness should not be used as the sole or primary basis for making operational decisions because the extent to which the measures reflect the contribution of teachers themselves, rather than other factors, is not understood." National Academies, Board of Testing and Assessment (October 5, 2009), *Letter Report to the U.S. Department of Education on Race to the Top Proposal,* Washington, D.C. at 10, available at www.nap.edu/catalog/12780. Similarly, while generally endorsing the usefulness of value-added modeling to provide quantitative information for improving educational processes, the American Statistical Association stresses that "VAMS typically measure correlation, not causation: Effects – positive or negative – may actually be caused by other factors that are not captured in the model." ASA Statement at 2. "The majority of the variation in test scores is attributable to factors outside the teacher's control such as student and family background, poverty, curriculum and unmeasured

influences." *Id.* at 7.

32.    The particular value-added methodology that HISD uses is one developed and marketed by a private software company called SAS®. SAS® provides a product called the Educational Value-Added Assessment System ("EVAAS" ®).   The EVAAS system is controversial. *See, e.g.,* Amrein-Beardsley, A., & Collins, C. (2012), *The SAS Education Value-Added Assessment System (SAS®EVAAS®) in the Houston Independent School District (HISD): Intended and Unintended Consequences,* Educational Policy Analysis Archives.

33.    Using a complex and opaque methodology, SAS® produces a value-added "EVAAS® score" for individual teachers, referred to as the Teacher Gain Index (TGI) score, based on the performance of the teacher's students. While SAS® refers to it as a "score," it is actually only a statistical estimate. EVAAS® uses a student's performance on prior standardized tests to predict the level of growth that a student should have in a given year and then, using the test scores from the year in question, purports to determine whether the student has demonstrated the expected growth. How much a student is expected to grow is just a statistical estimate, based on the student's past performance on tests. As an example of how different value-added methodologies vary, the EVAAS® method does not control for socioeconomic or demographic variables in making its predictions about a student's performance, while many other such models do try to control for these factors. *See* A Response to Criticisms of SAS® EVAAS®, William L. Sanders, S. Paul Wright, June C. Rivers, Jill G. Leandro, November 2009 at 5.

34.    Algebraically, the EVAAS® teacher value-added model is expressed as follows:

$$y_{ijkl} = \mu_{jkl} + \left( \sum_{k^* \leq k} \sum_{t=1}^{T_{ijk^*l^*}} w_{ijk^*l^*t} \times \tau_{ijk^*l^*t} \right) + \epsilon_{ijkl}.$$

In the model, *"yijkl* is the test score for the *i*th student in the *j*th subject in the *k*th grade in the *l*th year. *tijk\* l\* t* is the teacher effect of the *t*th teacher on the *i*th student in the *j*th subject in grade *k\** in year *l\**." SAS® EVAAS® Statistical Models, S. Paul Wright, John T. White, William L. Sanders, June C. Rivers, March 25, 2010 at 7.

35. Beginning in 2013, the TGI score has been calculated based on a comparison of the growth of the teacher's students against the average growth of students statewide. *See* HISD Campus and Teacher Reports Questions and Answers, available at www.houstonisd.org/ASPIRE. (In prior years, the score was tied to the average growth of students in HISD.)   If a teacher has a negative value-added TGI score, HISD takes that to mean that, on average, the teacher's students did not achieve the expected level of growth. If the teacher has a positive value-added TGI score, HISD takes that to mean that, on average, the teacher's students exceeded the expected level of growth.

36.   TGI scores are calculated for each qualifying course, subject, and grade level ("preps") for which a teacher is responsible.   If teachers have multiple preps, then they will have multiple TGI scores. Multiple TGI scores are averaged into a composite TGI score. *See* Appendix B to HISD's Student Performance Guidebook, available at http://hisdeffectiveteachers.org/assets/SP_Guidebook_7-11-12_FINAL_with_links.pdf.

37.   Once SAS® calculates the TGI scores, the scores are translated into a performance rating with 5 values assigned, based on growth rate compared to the standard for academic growth:

| VALUE-ADDED RATING | EVAAS® TGI SCORE | RELATIONSHIP TO EXPECTED AVERAGE GROWTH |
|---|---|---|
| Well above | Equal to or greater than 2 | Students on average substantially exceeded expected average growth |
| Above | Equal to or greater than 1 but less than 2 | Students on average exceeded average growth |
| No detectable difference | Equal to or greater than -1 but less than 1 | Students on average met expected growth |
| Below | Equal to or greater than -2 but less than -1 | Students on average fell short of average growth |
| Well below | Less than -2 | Students on average fell substantially short of expected average growth |

*See* Sample Value-Added Report, attached and incorporated herein as Exhibit A.

38.    The student test scores used to generate the EVAAS® scores are not available until after the students take the standardized tests in late spring of a given academic year. HISD provides the student test data to SAS®, which then builds the statistical model over the next several months and calculates the TGI scores. Thus, for those teachers receiving EVAAS® scores, it is not possible for HISD to provide teachers with their student performance rating or their completed performance appraisal until well into the following school year, when the teacher is already teaching a different group of students.

39.    More than one-third of HISD teachers receive EVAAS® scores based on STAAR, or Stanford.

**D.    Penalties and sanctions for low EVAAS scores.**

40.    If the teacher's students did not achieve the expected level of growth, HISD holds the teacher responsible and imposes a range of penalties and sanctions. HISD uses EVAAS® as a basis for a number of high stakes employment decisions. HISD considers low EVAAS® scores to constitute good cause for termination and nonrenewal. *See* HISD Policy DFBB (Local)

15

(identifying "insufficient student academic growth as reflected by value-added scores" as a reason for nonrenewal). For example, at the end of May 2013, HISD took contract action against at least 21 teachers on continuing and term contracts, based on their EVAAS® scores.

41.    Further, a low EVAAS® rating triggers the imposition of a prescriptive plan for assistance (also known as a "growth plan"), which require the teachers to complete additional training, professional development, and tasks. Teachers with low EVAAS® ratings are not eligible for individual merit pay bonuses. Such teachers are not eligible for transfer to another campus. HISD has denied such teachers the opportunity to teach summer school for extra income.

42.    Plaintiffs Daniel Santos, Myla Van Duyn, and Araceli Ramos, all exceptional teachers, were placed on growth plans after their 2013 EVAAS® scores came out in the fall of 2013 as supposedly showing below average effectiveness.

E.    **The vague standard of sufficient student growth.**

43.    While HISD will penalize and fire teachers for demonstrating "insufficient student academic growth as reflected by value-added scores," the level of growth that it considers sufficient, with its necessary reference point of "average growth," is not defined. Indeed, the average growth for the students that a teacher is responsible for, and below which they cannot fall, is not determined until the student test scores are calculated over the summer and the teacher is no longer teaching them. Thus, at no time during the school year does a teacher know the level of growth that the students will need to demonstrate; she finds this out only after her scores come out in the fall and the students have moved on.

44.    Additionally, a teacher's ratings are recalibrated yearly, as more data about student scores are added to the model. *See* HISD Campus and Teacher Reports Questions and Answers,

available at www.houstonisd.org/ASPIRE.Thus, it is not uncommon for a teacher to be assigned a particular rating for one year and when a new report is issued, for that rating to be changed. For example, in 2012, based on her students' scores, plaintiff Joyce Helfman received a rating of average effectiveness in teaching language, although based on the same students' scores in reading, she also received a rating of least effective. The next year, 2013, her students' growth projections from the prior year were recalibrated. In 2013, her value-added report shows that her rating for 2012 had gone down from average effectiveness to below average in language while her rating in reading had gone up from least effective to approaching effectiveness.

45.   HISD does not provide meaningful or sufficient information about the connection between teaching behavior and the students' test performance. While teachers receive an EVAAS® score and accompanying value-added report which shows, for example, the growth of the teacher's students in comparison with the growth of other students or the levels of student achievement in prior years versus the year at issue, the information that is made available to teachers does not reveal what teachers really need and want to know: what is the cause and effect between the teacher's teaching performance and the student's test performance. A sample of a teacher's value-added report is attached and incorporated herein as Exhibit A.

46.   As teachers search for an explanation for the different ratings that they receive from year to year, HISD provides only useless generalities, such as: "[I]f your results change from one year to the next with a different student group, consider these questions: 1) Could the curriculum and instruction have been better suited to the needs of one student group than another? 2) Did any other changes on the campus influence students' academic growth (*e.g.,* schedule, instructional support, intervention, student population, etc.)?" *See* HISD Campus and Teacher Reports

Questions and Answers, available at www.houstonisd.org/ASPIRE. As to the first question, this suggestion is of no practical effect because at the point in time when the teacher receives the EVAAS® scores, he is no longer teaching those students. The factors listed in the second question are equally useless because those variables, which do indeed affect student performance, are completely out of the teacher's control.

47. The EVAAS® system does not inform teachers about what they could or should be doing differently in their teaching practices to yield the test results demanded by the school district and for which they are being held responsible.   Teachers are not informed what they are doing differently from year to year that could explain the swings in scores that they experience. HISD does not provide this explanation because HISD does not know why they occur. Without this information, not only are the teachers not informed in advance of the standard that they will be held responsible for meeting but they are also not informed how to conform their behavior to meet it.

48. For example, plaintiff Joyce Helfman's EVAAS scores in reading and language usage have swung widely from year to year, despite the fact that she has taught eighth grade English at the same school in essentially the same fashion for a number of years. In 2013, her students' scores of well above average growth earned her a designation of most effective; in 2012, scores of below average growth earned her a designation of approaching average effectiveness; in 2011, average effectiveness; in 2010, below average, and in 2009, above average. Similar swings are seen in her language usage scores. In 2013, her students' scores generated a rating of above average effectiveness; in 2012, she was rated as approaching average effectiveness; in 2011, she was rated as most effective (contrast that with her average effectiveness rating in reading); in 2010, above

average. HISD has not provided plaintiff Helfman with anything approaching an adequate explanation for the swings in her scores.

49.    As another example, plaintiff Dewey's scores have also been unstable although he teaches the same subject, Advanced Placement U.S. history, year after year. For example, in 2011 – 2012, Mr. Dewey's EVAAS score was so high that he earned the top merit pay award that HISD distributed that year and earned the designation of "most effective" teacher. In 2012 – 2013, his EVAAS score swung sharply down because his students did not do as well as they had been predicted to do or because the estimates of how well they would do were wrong, so that in any event, Mr. Dewey went from being deemed one of the highest performing teachers in HISD to one making "no detectable difference" for his students. HISD could not provide an explanation about what this dip in scores had to do with Mr. Dewey's teaching.

**F. The Misuse of EVAAS Scores In Other Performance Measures.**

50.    While teachers are supposed to be appraised and rated separately in each of the three areas -- student performance, instructional practice and professional expectations -- the EVAAS® scores that teachers receive are negatively affecting their ratings in instructional practice. As opposed to measures of student performance, a teacher's strengths and weaknesses in instructional practice are supposed to be evaluated based on classroom observations of teaching performance in accordance with a specified set of 13 different criteria. *See* HISD Teacher Appraisal and Development System, Rubrics, available at http://hisdeffectiveteachers.org/individualized-support/resources-for-teachers-and-appraisers/rubric.pdf.

51.    On information and belief, HISD has directed and pressured its campus

19

administrators to ensure that the instructional practice ratings "align" or "match" the EVAAS®

ratings that a teacher receives so that there is not a significant discrepancy between the ratings that

a teacher receives for instructional practice and her student performance outcomes as measured by

the value-added metric. For example, in its Year One Summary Report concerning its newly

restructured appraisal system, with its heavy emphasis on student performance to drive teacher

ratings, HISD stresses two related findings:   "While there is a meaningful, positive relationship

between Instructional Practice ratings and school level EVAAS®, many schools are not aligning

their assessment of classroom practice with student growth," and "[i]ndividual teacher ratings and

student growth are also correlated, though there is significant room for improvement in aligning

teacher IP [instructional practice] scores to student outcomes." HISD Teacher Appraisal and

Development System – Year One Summary Report (November 2012) at 3, available at

http://hisdeffectiveteachers.org/yearonesummary. In its report, HISD compiled statistics showing

that 77% of teachers with low EVAAS® scores in 2011-2012 received at least a Level 3 for their

instructional practice rating. *Id.* at 14.

52.   On information and belief, HISD has directed and/or pressured its campus

administrators to conduct classroom observations for teachers who received low EVAAS® ratings

in October 2013, to manufacture deficiencies or otherwise find fault with the instructional

practices demonstrated by the teacher in the classroom and to score the teacher accordingly on the

instructional practice criteria, and to place such teachers on growth plans to correct the

manufactured instructional practice deficiencies. Again, the two measures, instructional practice

and student performance, are designed to be evaluated separately and student performance is not

an expressed criterion for evaluating a teacher's instructional practice. See *See* HISD Teacher

Appraisal and Development System, Rubrics, available at

http://hisdeffectiveteachers.org/individualized-support/resources-for-teachers-and-appraisers/rub

ric.pdf. Teachers who receive average or better EVAAS® scores are not subjected to this practice.

53.    In 2013, HFT conducted a survey of HISD principals. Seventy (70) principals

responded. Of those, 74% stated that they were pressured to give lower scores on observations and

evaluations than they thought teachers deserved.

54.    For example, plaintiffs Daniel Santos, Myla Van Duyn, and Araceli Ramos were

placed on growth plans following the release of their below average EVAAS® scores in the fall of

2013. Prior to this time, these veteran teachers had been rated as effective teachers who met or

exceeded expectations in their instructional practices. Once their EVAAS® scores came out,

however, these teachers were suddenly deemed deficient in various instructional practices and

placed on growth plans. Plaintiff Paloma Garner, while not placed on a growth plan, has

experienced lower ratings in instructional performance after her EVAAS® scores came out even

though in past years she has been rated as exceeds expectations.

**G.    EVAAS scoring is secret and opaque.**

55.    Under its contract with SAS® to generate EVAAS® scores for its teachers, HISD

provides the student test data to SAS® and is also responsible for providing information to SAS®

about which teachers teach which students. SAS® then merges and performs the statistical analysis

of the data provided by HISD and produces the EVAAS® scores and various EVAAS® reports.

56.    HISD does not require SAS®, as a condition of performing this work for HISD, to

make its statistical modeling analysis available to HISD or its teachers.

57.    HISD does not independently verify the statistical analysis performed by SAS® that

results in the EVAAS® scores assigned to HISD teachers.

58.  In accordance with the service contract that HISD and SAS® signed, HISD claims that the analysis that SAS® uses to calculate EVAAS® scores is a proprietary trade secret and that it neither owns nor has access to the information regarding the EVAAS® calculations.

59.  On November 13, 2013, under the provisions of Tex. Govt. Code Section 552.001 *et seq.* ("TPIA"), HFT submitted a Public Information Act request related to the EVAAS® scores of dozens of its members. Consistent with similar responses to similar requests in the past, HISD provided a limited response. While SAS® has made available some information regarding its statistical analysis, such as its algebraic formulas and general descriptions of its statistical models, it has refused to release other critical information, including but not limited to the computer source codes, decision rules, and statistical controls which are used to actually merge the data, perform the analysis, and generate the scores. Thus, for example, in response to a request for the computer source codes used to generate the EVAAS® scores for a list of its members, HISD responded that it did not possess documents responsive to the request. When asked for the decision rules, the methodological assumptions, every step and decision applied in the value-added analysis used to generate the EVAAS® scores, and other specific information regarding the execution of the modeling used to produce the scores, HISD only provided general descriptions.

60.  Without this information, it is impossible for a teacher to be able to examine or replicate the analysis, verify the analysis and the resulting score, establish that an alternative value-added model would show that the teacher's students showed academic growth, establish that the assigned score is an unreliable measure, or effectively challenge the analysis performed by SAS® or the resulting EVAAS® score.

61.    Neither HFT nor any of its affected members, including but not limited to the named plaintiffs, is able to compel the production of this information. Under Texas law governing teacher terminations and contract non-renewals, a teacher is not permitted to wait until the hearing on her termination or non-renewal to challenge an EVAAS® score or other negative performance documentation. Thus, even assuming, *arguendo*, that a teacher could obtain such third-party information during the course of a termination or non-renewal, a proposition with which the plaintiffs do not agree, it would be too late in that process to raise a complaint about an EVAAS® score. The only mechanism available to secure information at this juncture is through a Texas Public Information Act request to HISD, an avenue which has been effectively foreclosed by the actions of SAS® and HISD to hide this information. HISD teachers are deprived of a meaningful opportunity to verify or challenge their ratings.

**H.    Special problems: middle school science and social studies teachers.**

62.    EVAAS scores in core subjects are usually based on students results on the STAAR exam but as described above, not all core subjects are STAAR-tested in all grades. *See* Student Performance Measures by Grade Level, available at http://hisdeffectiveteachers.org/assets/Measures_by_Grade_Level_Revised_10_4_12.pdf. For those grades and subjects that are not STAAR tested, HISD uses the Stanford/Aprenda test as a basis for the teacher's value-added score, the first measure of student performance.

63.    Unlike STAAR tests, the Stanford/Aprenda test is not based on the state curriculum standards; instead, it is a national test based on the testing company's more general determination of what knowledge a student at that grade level should know about a particular topic. HISD has determined that the Stanford/Aprenda curriculum is not sufficiently aligned to what HISD requires

a teacher to teach in order for a student's performance on the Stanford/Aprenda to be an appropriate measure of a teacher's effectiveness in the following areas: Social Studies in Grades 4, 5, 6 and 7, and Science in Grades 4, 6, and 7. *See* Appendix B to HISD's Student Performance Guidebook at 46, available at

http://hisdeffectiveteachers.org/assets/SP_Guidebook_7-11-12_FINAL_with_links.pdf.

 64. SAS® has stated that in order for test data to be used in the EVAAS® analysis, it must be "highly correlated" with the state's curricular standards. SAS® EVAAS® Statistical Models, S. Paul Wright, John T. White, William L. Sanders, June C. Rivers, March 25, 2010 at 2. HISD has also stated that one of the "guiding principles" of its evaluation system is the necessity that the "measures should be sufficiently aligned" to the curriculum. *See* HISD's Student Performance Guidebook at 2 - 3, available at

http://hisdeffectiveteachers.org/assets/SP_Guidebook_7-11-12_FINAL_with_links.pdf.

 65. The acknowledged lack of alignment means that the Stanford/Aprenda test results used to generate the EVAAS® scores are not based on what these middle school teachers are actually teaching. For example, in 2013, plaintiff Daniel Santos, a sixth grade social studies teacher, received a value-added report deeming him as "least effective" because his students performed well below expectations on a test that did not test them on what he was required to have taught them. Ivan Castillo, a fourth grade bilingual teacher who was required this year, 2013 – 2014, to also teach fourth grade social studies, faces the same situation for this year's ratings. These teachers, and hundreds of others like them, are being held accountable for how their students perform on tests covering subject matter for which the teacher is not responsible and indeed, which the teacher would not be able to cover since the teacher is busy teaching the required Texas

curriculum.

**I.    Special problems: teachers of English language learners.**

66.    HISD and SAS® have acknowledged that when students who are English language learners take the STAAR or Stanford test in English, there is frequently a decline in test scores. For example, SAS® has stated that "[s]tudents transitioning from Spanish tests to English tests typically score measurably lower on the English test in their first year." SAS® EVAAS® "Adjusting for Spanish to English Transition Teachers (2013). Even HISD does not contend that the lower scores are attributable to the teacher; instead, they are attributable to the fact that the students are taking the test in English.

67.    HISD has represented that the EVAAS® statistical analysis will be manipulated in such a manner to ensure that teachers with a large number of transitioning students will not be disadvantaged. *See* Appendix B to HISD's Student Performance Guidebook at 46, available at http://hisdeffectiveteachers.org/assets/SP_Guidebook_7-11-12_FINAL_with_links.pdf.

68.    In its November 13, 2013, TPIA request to HISD, HFT sought the data related to the manipulation of the scores for the transitioning ESL students of the teachers included in the request. When HISD submitted its response, it did not provide the requested data but instead, only included a general description of the process that EVAAS® uses, making it impossible to examine, verify or challenge the manipulation.

69.    As a consequence of teaching a large number of English language learners, numerous HFT members received EVAAS® scores that reflected a below average level of student growth. This level of student growth is not attributable to the teacher's teaching practices.

**J.    Special problems: teachers of academically high-achieving students.**

25

70. Teachers of high-achieving students are still required to demonstrate that their students showed above-average growth on standardized tests; otherwise, the teacher receives an EVAAS® score that reflects a below average level of student growth.

71.    HISD has acknowledged that when some high-achieving students take standardized tests, they do not show improvement because their scores are already quite high and cannot be significantly improved. *HISD's Introduction to Student Performance, Teacher Appraisal & Development System, October 2011.* The teachers of those students experience what HISD has termed the "ceiling effect."   Even HISD does not contend that the students' failure to show growth is attributable to the teacher; instead, the lack of improvement is attributable to the fact that the students have reached the ceiling of how well they perform on standardized tests.

72.    HISD has represented that the EVAAS® statistical analysis will be manipulated in such a manner to ensure that teachers with a large number of previously high-achieving students can show above-average growth. HISD had stated that "appropriate adjustments are made" when a teacher experiences a ceiling effect. *See* Appendix B to HISD's Student Performance Guidebook at 46, available at

http://hisdeffectiveteachers.org/assets/SP_Guidebook_7-11-12_FINAL_with_links.pdf.

73.    In its November 13, 2013, TPIA request to HISD, HFT sought the data related to the manipulation of the scores to ensure that teachers of previously high-achieving students can show above-average growth with their students. When HISD provided its response, it stated that it did not have such documents, making it impossible to examine, verify or challenge the manipulation.

74.    As a consequence of teaching a large number of high-achieving students, numerous HFT members such as Andy Dewey and Myla Van Duyn received EVAAS® scores that reflected

26

a below average level of student growth. This level of student growth is not attributable to the teacher's teaching practices.

## VI. CAUSES OF ACTION

75.    Paragraphs 1 through 74 are incorporated herein.

76.    The due process clause of the Fourteenth Amendment forbids government conduct that deprives "any person of life, liberty, or property without due process of law." The due process clause provides two major types of protection. First, substantive due process bars certain arbitrary, wrongful government action regardless of the fairness of the procedures used and may require courts to void certain types of government action that infringes upon individual rights and freedom of action.    Substantive due process requires that a government policy provide "fair warning" of prohibited conduct. The policy must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties. If a policy either forbids or requires the doing of an act in terms so vague that people of common intelligence must necessarily guess at its meaning and differ as to its application, it violates the due process clause. Second, procedural due process requires the government to ensure that individuals are afforded certain procedures before they are deprived of life, liberty, or property.

## A.   Substantive due process violations.

### i. As applied to all teachers.

77.   All HISD teachers possess a property interest in their employment during the term of their employment contracts.   A mid-term termination of any teacher must meet constitutional due process standards. Additionally, since continuing contract teachers have a contract of indefinite duration, a termination of a continuing contract teacher at any time must meet such standards.

27

78.    HISD's policy and practice to take contract action against teachers for "insufficient student academic growth as reflected by value-added scores" violates their right to substantive due process because it is unconstitutionally vague. It does not provide fair notice to teachers about what level of student academic growth will be determined to be sufficient/insufficient during the year in which the teachers are responsible for providing instruction to the students whose test scores form the basis for the EVAAS® score. Additionally, the standard is unconstitutionally vague because HISD's EVAAS® system fails to inform teachers about what conduct on their part, if any, has caused the students not to show the required level of academic growth.

79.    Further, the standard is arbitrary because the standards for effective performance are continually being readjusted so that the same performance for the year in question will be rated differently from one year to the next, with shifting consequences for the teacher. The constant recalibration of teachers' EVAAS® scores means that employment decisions and consequences will be based at least in part on imprecise and volatile estimates which will change, rendering reliance on them arbitrary.

80.    EVAAS® scores are an arbitrary and capricious measure of teacher effectiveness because they are unstable and imprecise, and cannot reasonably be used to draw conclusions about the performance of individual teachers for the purposes of high stakes employment decisions.

**ii. As applied to teachers with below average EVAAS® scores.**

81.    HISD's policy and practice of penalizing teachers who receive below average EVAAS® scores for student performance by subjecting them to manufactured and arbitrary deficiency ratings in the area of instructional practice to insure that their ratings in instructional practice align with their student performance ratings is a violation of their substantive due process

28

rights.

### iii. As applied to middle school science and social studies teachers.

82.   The substantive due process component of the due process clause requires that an individual's property rights should not be impaired or infringed upon for arbitrary reasons. HISD itself has determined that for grades 6 - 8 in both science and social studies, the standardized test being administered to students, and upon which scores the EVAAS® scores are based, does not align with HISD curriculum. Accordingly, middle school science and social studies teachers are being held accountable for how their students perform on tests covering subject matter that the teacher does not teach.

83.   It is arbitrary, irrational and unfair to attribute student test scores in grades 6 - 8 in science and social studies to their teachers, as HISD does with its EVAAS® scores.

### iv. As applied to teachers of English language learners.

84.   HISD itself has acknowledged that when students who are English language learners take the STAAR or Stanford test in English, there is frequently a decline in test scores. This drop-off is not a result of the teacher's teaching practices but is a result of the students' transition to taking the test in English for the first time.

85.   For teachers of large numbers of students transitioning to English, it is arbitrary, irrational and unfair to attribute below-average growth to their teachers, as HISD does with its EVAAS® scores.

### v. As applied to teachers of academically high-achieving students.

86.   HISD has acknowledged that when some high-achieving students take standardized tests, they do not show improvement because their scores are already quite high and cannot be

significantly improved. The failure of these students to show growth is not the result of the teacher's teaching practices but is a result of the students having reached the ceiling of how well they perform on standardized tests.

87.    For teachers of large numbers of previously high-achieving students, it is arbitrary, irrational and unfair to attribute below-average growth to their teachers, as HISD does with its EVAAS® scores.

**B. Procedural due process violations.**

88.    The opportunity to defend against an employer's charges is the essence of procedural due process in an employment context. It is not constitutionally acceptable for HISD to shield the information necessary for a teacher to verify or challenge an EVAAS® score behind a cloak of secrecy and at the same time, use the score as a sword against the teacher. HISD's actions deprive a teacher of the right to effectively defend against a charge that her students have demonstrated insufficient academic growth as reflected by EVAAS® scores.

89.    HISD's refusal to provide teachers with information necessary to verify or challenge EVAAS® scores in conjunction with their performance appraisal violates their procedural due process rights. The inability of teachers to gain access to necessary and sufficient information to challenge their EVAAS® scores in conjunction with their performance appraisal burdens and compromises their property interest in continued employment because their ability to contest a subsequent termination proceeding based on those scores will be unreasonably limited. Under state law, a teacher is required to grieve a performance appraisal, including student performance scores, at the time she receives it. Even assuming, *arguendo*, that a teacher would be able to secure additional information related to the EVAAS® score in the context of a proposed termination

action (itself a dubious proposition), the due process hearing that is provided under state law will not be adequate to protect the teacher's property interest because her opportunity for a full attack on the EVAAS® score will have been compromised.

**C. Equal Protection violations.**

90. The equal protection clause of the Fourteenth Amendment commands that no state shall deny to any person within its jurisdiction the equal protections of the laws. This essentially means that all persons similarly situated should be treated alike. Classifications that are the result of public policy must, at the very least, bear a rational, non-arbitrary, relationship to a legitimate governmental purpose.

91. HISD has created a classification system of teachers with below average, average and above average EVAAS® scores.   HISD is requiring that its campus administrators align the teachers' instructional practice scores with the EVAAS® scores that the teachers have received for student performance, rather than allowing teachers' instructional practice to be measured by the criteria designed for that purpose.   Teachers with below average EVAAS® scores are subjected to harsher, irrational, and arbitrary standards in the measurement of their instructional practices while teachers with average or better scores are not.

## VII. SUIT FOR DECLARATORY RELIEF

92.   Paragraphs 1 through 91 are incorporated herein.

93. The federal Declaratory Judgment Act, 28 U.S.C. Section 2201, provides that "in the case of actual controversy within its jurisdiction...any Court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested parties seeking such declaration, whether or not further relief is or could be sought." The plaintiff requests

that the Court declare and determine the rights of its members pursuant to these provisions.

### VIII.    PRAYER FOR RELIEF

94.    WHEREFORE, the plaintiffs pray that following a hearing, they be granted the following relief:

a.    That pursuant to 28 U.S.C. Section 2201, the Court enter a declaratory judgment that HISD's policies, practices and actions, as described herein and applied to HFT members and the individual plaintiffs, violate the rights of teachers under the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution;

b.    That pursuant to 28 U.S.C. Section 2201, the Court enter a declaratory judgment that HISD's policies, practices and actions, of refusing to provide the information necessary to verify or challenge an EVAAS® score, as described herein and applied to HFT members and the individual plaintiffs, violates the rights of these teachers under the due process clause of the Fourteenth Amendment to the United States Constitution;

c.    That the Court enjoin defendant HISD from using EVAAS® scores, or teacher performance ratings that are based in whole or in part on EVAAS® scores, in evaluating teachers, terminating or non-renewing teachers, making high stakes employment decisions, and otherwise burdening and impairing their constitutional rights;

d.    That the Court enjoin HISD from evaluating teachers and otherwise burdening and impairing their constitutional rights by subjecting teachers with below average EVAAS® scores to arbitrary standards of measurement of their instructional practices;

e.    In the alternative, that the Court enjoin HISD from refusing to provide the information necessary for teachers to verify or challenge an EVAAS® score;

f.  In the alternative, to the extent that the Court does not enjoin, *in toto*, the use of EVAAS® scores as requested herein, that the Court enjoin the use of EVAAS® scores in evaluating and taking employment action against middle school science and social studies teachers.

g.  In the alternative, to the extent that the Court does not enjoin, *in toto*, the use of EVAAS® scores as requested herein, that the Court enjoin the use of EVAAS® scores in evaluating and taking employment action against teachers of English language learners.

h.  In the alternative, to the extent that the Court does not enjoin, *in toto*, the use of EVAAS® scores as requested herein, that the Court enjoin the use of EVAAS® scores in evaluating and taking employment action against teachers of high-achieving students.

i.  That the Court award plaintiff attorney's fees and costs pursuant to 42 U.S.C. Section 1988;

j.  That the Court grant any other relief to which the plaintiff may be entitled.

Respectfully Submitted,

DEATS, DURST, OWEN & LEVY, P.L.L.C.

Martha P. Owen
State Bar No. 15369800
Federal ID No. 38041
1204 San Antonio, Suite 203
Austin, Texas    78701
(512) 474-6200 - Telephone
(512) 474-7896 - Telecopier

**Attorney for Plaintiffs**

33

# SAS® EVAAS® Teacher Value–Added Report for 2013
## Houston Independent School District

**School:**
**Teacher:**
**Subject: STAAR 3–8/Stanford Social Studies, Grade 6**

| Year | Teacher Growth Measure | Standard Error | Standard for Academic Growth | Comparison to Standard for Academic Growth | Teacher Gain Index |
|------|------------------------|----------------|------------------------------|--------------------------------------------|--------------------|
| 2012 2013 2–Yr Avg | −3.1 | 1.0 | 0.0 | Well Below | −3.19 |

Estimates are from multivariate, longitudinal analyses using all available test data for each student (up to 5 years). The analyses were completed via SAS® EVAAS® methodology and software, which is available through SAS Institute Inc. EVAAS, SAS, and all other SAS Institute Inc. product or service names are registered trademarks or trademarks of SAS Institute Inc. in the USA and other countries. ® indicates USA registration. Other brand and product names are trademarks of their respective companies. Copyright © 2013 SAS Institute Inc., Cary, NC, USA. All Rights Reserved.

## Interpreting the Teacher Value–Added Report

Use this report to evaluate how well a teacher facilitates student progress. The **Teacher Value–Added Report** compares each teacher's growth measure to the Standard for Academic Growth. This comparison indicates how a teacher influences student progress in the given subject.

### Teacher Growth Measure, Standard Error

The **Teacher Growth Measure** is a conservative estimate of a teacher's influence on students' academic progress estimated by using all students linked to a teacher who were tested on STAAR or Stanford/Aprenda in non-STAAR grades and subjects. It is expressed in state intra-year NCEs. The **Standard Error** provides the basis for establishing a confidence band around the Teacher Growth Measure value. The Standard Error is used in the statistical test reported under **Comparison to Standard for Academic Growth.** Previous years' growth measures have been recalculated in 2013 to incorporate students' most recent testing data and may have changed.

### Standard for Academic Growth

The **Standard for Academic Growth** is the average progress of students in the state of Texas in this subject and grade.

### Comparison to Standard for Academic Growth

The **Comparison to Standard for Academic Growth** column shows whether there is a difference in the progress rate for this teacher compared to the **Standard for Academic Growth.** Comparisons are made based on the standard error as below.

- **Well Above,** Most Effective: Teachers whose students are making decidedly more progress than the Standard for Academic Growth (the teacher's index is 2 or more).
- **Above,** Above Average Effectiveness: Teachers whose students are making more progress than the Standard for Academic Growth (the teacher's index is equal to or greater than 1 but less than 2).
- **NDD,** Average Effectiveness: Teachers whose students are making progress equal to the Standard for Academic Growth (the teacher's index is equal to or greater than −1 but less than 1).
- **Below,** Approaching Average Effectiveness: Teachers whose students are making less progress than the Standard for Academic Growth (the teacher's index is equal to or greater than −2 but less than −1).
- **Well Below ,** Least Effective: Teachers whose students are making decidedly less progress than the Standard for Academic Growth (the teacher's index is less than −2).

### Teacher Gain Index

To calculate the **Teacher Gain Index,** divide the **Teacher Growth Measure** by the **Standard Error.** The 2012 Teacher Gain Index has been recalculated to use the Standard for Academic Growth instead of the HISD Reference Gain.

EXHIBIT

A